## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-00423 (CJN)** |
| **v.** | : | |
| | : | |
| **DANIEL BIBONGE AMSINI,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Daniel Amsini to 3 months' incarceration, one year of supervised release, 60 hours of community service, and, consistent with the plea agreement in this case, $749 in restitution.

### I.    Introduction

Defendant Daniel Amsini, a 31-year-old Uber/Lyft driver, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation

Amsini pleaded guilty to a misdemeanor violation of 18 U.S.C. § 641. The government's recommendation is supported in this case because Amsini (1) ignored several red flags upon entering the Capitol Building at 2:18 p.m. including shards of glass scattered on the ground outside the Senate Wing Door and a blaring alarm coming from the Capitol Building; (2) participated in the breach of a police line in the Crypt; (3) watched and applauded as rioters clashed with police and breached the East Rotunda Doors ("Rotunda Doors"), and shouted "Treason!"; (4) entered and remained in the Senate Chambers/Senate Gallery, an incredibly sensitive and symbolically significant area of the Capitol Building, just 25 minutes after Senators and the Vice President had to be evacuated from the Chamber; (5) posted on social media from the Senate Gallery that "The police evacuated senators before we got to the top floor" and he and fellow rioters were trying to subject Senators to "citizen arrest cause the justice courts have failed us"; (6) stole government property, specifically a ILC Dover Scape CBRN30 escape hood, a device for rapid deployment by individuals responding to emergency situations; and (7) remained inside the Capitol Building for approximately 48 minutes.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Amsini's crime support a sentence of 3 months' imprisonment in this case and one year of supervised release.

---

with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

## II.      Factual and Procedural Background

*The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 22 (Statement of Offense), at ¶¶ 1-7.

*Defendant Amsini's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Daniel Amsini traveled from his home in Arlington, Virginia to Washington.  As he later reported to the FBI, Amsini attended the "Stop the Steal" rally where he listened to former President Trump's speech, then marched to the U.S. Capitol.  While outside on the Capitol Grounds, Amsini witnessed people going inside the Capitol Building, which he knew was not allowed, and he heard what he later described as gunshots. He made his way up to the Senate Wing Door by climbing the wall.[2]  Amsini entered the Capitol through the Senate Wing Door and turned down the hallway to his right and subsequently saw rioters push back the police, which likely occurred in the Crypt. Once Amsini was inside the Senate Gallery, he recalled taking photographs with his cellphone.

The defendant entered restricted U.S. Capitol grounds and the Capitol Building. The images showed Amsini wearing a red hat with white lettering stating "Make America Great Again," a dark in color jacket with a white stripe on the front left arm and red stripe on the back of the left arm, and military-style camouflage pants. *See also* Statement of Offense, at ¶ 8. Amsini also had a dark color string bag, with a predominately white logo on it. *Id.*

---

[2]  This fact comes from Amsini's 2023 interview with the FBI.  To date, the government has not located independent photo or video evidence showing Amsini climbing the wall.



*Figure 1: Left, Photo of Amsini (circled in yellow) on the East Front stairs of the Capitol Building on January 6; Right, zoomed-in view of Assini in photo on left.*

Closed-circuit television ("CCTV") footage from the U.S. Capitol Building on January 6, 2021 confirmed Amsini's presence inside restricted Capitol grounds and the Capitol Building. Amsini entered the Senate Wing door at approximately 2:18 p.m. *See* Statement of Offense, at ¶ 8.  As Amsini was entering the building, he observed rioters breaking glass and heard an alarm blaring throughout the building as evidenced by third party recordings contemporaneous to his entrance, but continued forward.



*Figure 2: Still Image from Exhibit 1 – Amsini (circled in yellow) entering Senate Wing Door at timestamp 0:05*

After entering the Senate Wing Door, Amsini walked further into the Capitol Building. CCTV footage showed that A and joined a large group of rioters in the Crypt.  CCTV showed that, at approximately 2:20 p.m., Amsini witnessed a police line working to hold back the mob in the Crypt from going any further into the Capitol Building. *See* Figure 3.  Third-party video further revealed that Amsini was chanting "Our House!" with the mob in the Crypt, as the police line stood between the mob and access to the rest of the Capitol Building. *See* Figure 4. Amsini and the other rioters in the Crypt breached that police line at 2:25 p.m.



*Figure 3:*
*Still image from Exhibit 2 at 05:53 showing Amsini entering the Crypt.*

*Figure 4:*
*Still image from Exhibit 3 at 17:59 showing Amsini chanting in the Crypt.*



*Figure 5: Still image from Exhibit 4 at 27:04 showing Amsini after the police line in the Crypt was breached.*

After chanting with the mob in the Crypt, Amsini next spent time in and around the Rotunda starting at 2:33 p.m. While there, at approximately 2:38 p.m., Amsini witnessed and applauded as rioters breached the Rotunda doors that were guarded by USCP officers.  Those

rioters opening the Rotunda doors for other rioters outside of the building enabled those rioters outside to push violently past police and into the building.  While watching the chaos, Amsini also joined in chants of "treason."



*Figure 6: Still image from Exhibit 5 at 00:32 showing Amsini cheering on the rioters as they overtook the police and opened the Rotunda Doors for rioters outside.*



*Figure 7: Still image from Exhibit 6 at timestamp 0:20 while Amsini is chanting "Treason."*

After the 2:38 p.m. breach of the Rotunda Doors, at approximately 2:42 p.m., Amsini walked upstairs from the Rotunda Door area to the third floor of the Capitol Building. *See* Statement of Offense, at ¶ 9.



*Figure 8: Still Image from Exhibit 7 at timestamp 5:26 – Amsini walking upstairs from the Rotunda Door area.*

Amsini then proceeded down the East Corridor and eventually entered a sensitive area of the Capitol Building – the Senate Chamber – at approximately 2:48 p.m. *See id.*



*Figure 9: Still image from Exhibit 8 at timestamp 8:17– Amsini (yellow) entering the Senate Chamber.*

Open-source video[3] also captured Amsini entering the Senate Chamber and the Senate gallery within the Chamber where he shouted "we did it, we did it!" A nearby rioter said "yo, we need everybody in here now" and "yo, take laptops, paperwork, everything, all that shit." Moments later, Amsini left the Senate Chamber.



*Figure 10: Still image from open-source video at 01:05 – Amsini entering the Senate Chamber.*



*Figure 11: Open source photograph – Amsini inside the gallery of the Senate Chamber*

---

[3] source: https://propublica-data-j6cases-videos.s3.us-east-1.amazonaws.com/c032b810fe03013933e52cde48001122.mp4

While inside the Senate Gallery, Amsini remarked on a Snapchat posting that the Senators had evacuated before his arrival. Amsini spoke of subjecting U.S. Senators to a citizen's arrest, which further contextualizes his shouts of "treason" while he was near the Rotunda Doors.  In his post to Snapchat, shown below at Figure 12, Amsini said, "Made it to the chamber room.  The police evacuated senators before we got to the top floor.  We were trying citizen arrest cause the justice courts have failed us.  This just shows the power the people have when we come together."



*Figure 12: Amsini Snapchat post*

Amsini exited the Senate Chambers area with government property at approximately 2:50 p.m. *See* Statement of Offense, at ¶ 10.  Specifically, he picked up a ILC Dover Scape CBRN30

escape hood, which was stored in a bag clearly marked, "POLICE," and stuffed it in his own bag, as pictured below.



*Figure 13: Still image from Exhibit 8 at timestamp at 9:49 – Amsini with items taken while he exited the Senate Chamber, including a marked police bag.*

Amsini put the government property into his string bag at 2:52 p.m. The escape hood is an advanced air-purifying escape respirator which provides protection from carbon monoxide, chemical, biological, radiological and nuclear contaminants, and would be used for rapid deployment by individuals responding to emergency situations. *See* Statement of Offense, at ¶11. The replacement cost for an ILC Dover escape hood is approximately $249. *Id.*

11



*Figure 14: Still image from Exhibit 9 at timestamp 0:05 – Amsini further concealing items in his own bag.*

Amsini then exited the U.S. Capitol Building with the string bag containing the government property at approximately 3:06 p.m., making stealing government property his final, lingering act of disorderly conduct in the Capitol Building. *See id*. at ¶ 12.



*Figure 15: Still image from Exhibit 10 at timestamp 13:34 – Amsini exiting the Capitol Building with the string bag containing government property.*

*Amsini's Post-Arrest Interview*

On June 22, 2023, Amsini gave a voluntary post-arrest interview to the FBI.  During the interview, he admitted traveling to Washington because he was a Trump supporter and followed the news.

On January 6, Amsini described, he attended the "Stop the Steal" rally.  He then marched to the U.S. Capitol after listening to former President Trump's speech.  While outside on the Capitol Grounds, Amsini stated he knew he was supposed to stay outside but he witnessed people going inside the Capitol Building. Amsini also described hearing what he described as gunshots. The defendant said his curiosity caused him to enter the Capitol building. While moving from the Capitol Grounds to the Senate Wing Door, Amsini said that he climbed the wall rather than walked up the NW steps to the Upper West Plaza. Amsini entered the Capitol through the Senate Wing Door and turned down the hallway to his right and subsequently saw rioters push back the police, which likely occurred in the Crypt. Once Amsini was inside the Senate Gallery, he recalled taking photographs with his cellphone.

When asked about the ILC Dover Scape CBRN30 escape hood, he said that because he saw other rioters taking stuff, he decided to take the hood.  Amsini went on to state that he did not know what the hood was and he threw the hood away after leaving the Capitol Grounds.  However, he also acknowledged believing that the government property was "some police stuff."  He explained he was caught up in the moment that day.

*The Charges and Plea Agreement*

On June 20, 2023, Amsini was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. §§ 5104(e)(2)(B), (D), and (G). ECF No. 1. He was arrested on June 22, 2023. ECF No. 5.  On December 5, 2023, the United States charged Amsini by a one-

count Information with a misdemeanor violation of 18 U.S.C. § 641: Theft of Government Property (less than $1,000). On December 19, 2023, pursuant to a plea agreement, Amsini pleaded guilty to Count One of the Information, charging him with a misdemeanor violation of 18 U.S.C. § 641. By plea agreement, Defendant agreed to pay $749 in restitution to the Architect of the Capitol, which includes the cost of the stolen escape hood ($249).

### III.    Statutory Penalties

Amsini now faces a sentencing for a misdemeanor violation of 18 U.S.C. § 641. As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to twelve months of imprisonment and a fine of up to $100,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Probation Office's calculation of the applicable Sentencing Guidelines range:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B1.1(a)(2)) | 6 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |

**Total Adjusted Offense Level**                                                          **4**

*See* Draft Presentence Investigation Report ("PSR"), ECF No. 23, ¶ 39. Amsini's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

*U.S.S.G. § 4C1.1 Adjustment for Certain Zero-Point Offenders*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria.

While the Government concedes that Section 4C1.1 applies to Amsini, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption.  Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus Amsini's conduct caused a significant disruption to a vital governmental function, warranting

an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg. Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications criminal activity have gone mainstream.").

*Guidelines Range*

The U.S. Probation Office calculated Amsini's criminal history as category I, which is not disputed. PSR ¶ 42. Additionally, the U.S. Probation Office calculated Amsini's total adjusted offense level, after acceptance of responsibility and the two-level reduction pursuant to U.S.S.G. § 4C1.1, at 2, and his corresponding Guidelines imprisonment range at 0-6 months. PSR ¶¶ 29-39; 79. Amsini's plea agreement contains an estimated Guidelines range calculation that mirrors the U.S. Probation Office's calculation. ECF No. 21, ¶ 5(D).[4]

---

[4] Regardless of whether the total adjusted offense level is 4 (because the § 4C1.1 adjustment is applied) or 6 (because the § 4C1.1 adjustment is not applied, or because the Court grants a two-level variance to account for the reduction under 4C1.1), the Guidelines range is the same 0-6 months of imprisonment.

Here, while the Court must consider all of the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are be a powerful driver of consistency and fairness.

## V.      Sentencing Factors Under 18 U.S.C. § 3553(a)

In this Class A misdemeanor case, sentencing is also guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of the government's proposed 30-day sentence of incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Amsini's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Amsini, the absence of violent or destructive acts is not a mitigating factor. Had Amsini engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Amsini's case is the length and character of Amsini's presence inside the Capitol Building.  Amsini arrived on the grounds of the U.S. Capitol and entered the Capitol building at approximately 2:18 p.m.  In order to gain entry to the Capitol at that time, he would have crossed over broken down barricades and passed by bike racks that were intended to prohibit entry into the restricted Capitol grounds, but which had been pushed aside. Amsini informed agents that, prior to entering the Capitol building, he climbed the wall of the Northwest Steps.  He heard gunshots, and he knew that the people he saw entering the Capitol building were not authorized to be there.  On the West Front of the Capitol at that time, Amsini would have witnessed individuals climbing on scaffolding and on the media tower and he would have seen individuals confronting police officers.  It would have been clear to Amsini that police lines had been penetrated and that rioters had caused property damage.   Despite these circumstances, Amsini joined a crowd that advanced toward the Capitol building and joined a line of hundreds of rioters.  With the crowd, Amsini made entry through a non-public entrance at the Senate Wing Door approximately five minutes after the Capitol was first breached. Thus, he took advantage of the opportunity presented by the mob, ignored the violence and property damage taking place, and unlawfully entered the Capitol building.

While inside the Capitol and over the course of approximately 48 minutes, Amsini continued to protest, despite observing rioters breaking glass and hearing alarms blaring throughout the building.  Amsini continued deeper into the Capitol to the Crypt. There, he saw rioters pushing against police who were trying to prevent the rioters' further intrusion into the Capitol. Amsini was then present for and cheered on the 2:38 p.m. breach of the Rotunda Doors – a location which had already been breached earlier and which officers had fought hard to clear and resecure before the second breach of that location at 2:38 p.m.  Additionally, Amsini entered a

very sensitive area, the Senate Gallery, and celebrated being there by taking a selfie that he posted to Snapchat, bragging that he "made it to the senate room."  Moreover, distinct from many other misdemeanor January 6 defendants, he stole government property – specifically a piece of emergency equipment – that was in a clearly labeled police bag.  Amsini had been inside the Capitol Building over 30 minutes before he converted government property to his own use. Eventually, Amsini departed along with other rioters who police officers were directing and/or forcing to exit the building via the Rotunda Doors. Under all these circumstances, Amsini knew that he was not permitted to be inside the Capitol building, but he entered it and remained inside anyway.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Amsini's History and Characteristics

As set forth in the PSR, Amsini has no criminal history.  PSR ¶¶ 40-46.  The defendant grew up in Kinshasa, Democratic Republic of Congo. When he was 17 years old, Amsini immigrated to the United States to pursue higher education. He is a 2016 graduate of the University of Maryland with a Bachelor of Science in Financial Economics.

While Amsini did not proactively cooperate with the government or turn himself in, overall, Amsini has been cooperative with law enforcement throughout the course of the investigation. For example, at the time of his arrest, Amsini gave the FBI consent to search his cell phone.  Also, Amsini expressed an interest in entering a plea early in this case and accepted the plea offer shortly after it was offered. His social media promotion of his and others' breach of the Capitol also appears to be limited to the day of the riots.  Additionally, he was generally forthcoming in his interview with law enforcement.

He did, however, minimize his participation in the riot generally during his law enforcement interview and the theft in particular, rationalizing that he saw other rioters taking things and he was caught up in the moment. Video capturing his time in the Crypt, Rotunda, and Senate Gallery show moments of cool reflection. The defendant's failure to appreciate the wrongfulness of his actions warrants a meaningful sentence in this case.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be

deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a meaningful term of incarceration. Amsini's conduct involved a *series* of poor decisions and poor judgement  – Amsini went to several locations within the Capitol Building (entering through the Senate Wing Doors, then traveling to the Crypt, to the Rotunda

Doors, up to the third floor, to the East Corridor, and to the Senate Chamber/Senate Gallery (a sensitive area), before heading back downstairs and leaving); he joined in chants at multiple locations; he stole government property; and he did this over a period of almost an hour (48 minutes). There were several moments at which Amsini could and should have stopped himself, but he failed to do so.

Additionally, while taking a selfie inside the then-recently evacuated Senate Chamber, Amsini said his plan to conduct a citizen's arrest of Senators was thwarted.  Again, this shows that Amsini's actions were not just a momentary flash of someone caught up in an emotional crowd, distinguishing Amsini from other misdemeanor rioters who may have been carried away for just a moment. He was not deterred by the damage that his and other rioters' conduct caused—not just to the Capitol Building, but to our democracy at large.  This raises significant concerns about his willingness to engage in similar conduct again in the future. Also, a significant sentence in this case will communicate to the defendant that violence, destruction, and theft are never appropriate responses to lost elections.

The government acknowledges that the defendant has accepted responsibility by entering into a plea agreement. On the other hand, his failure to appreciate the collective impact of his and other rioters' actions on January 6 and his apparent lack of remorse for having stormed the Capitol underscore the need for a term of incarceration in this case.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[5] This Court must sentence Amsini based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Amsini has pleaded guilty to Count One of the Information, charging him with misdemeanor Theft of Government Property (less than $1,000), in violation of 18 U.S.C. § 641. This offense is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. William Merry*, 1:21-CR-00748, defendant Merry pled guilty to one misdemeanor count of 18 U.S.C. § 641.  Similar to Amsini, Merry also saw and heard red flags

---

[5] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

that should have discouraged him from entering the Capitol Building (e.g., rioters pushing barricades, glass on the ground, and an alarm blaring from the building); he entered the Senate Wing Door shortly after its initial breach (around 2:20 p.m.); he entered a sensitive area of the Capitol Building (Speaker's suite); he stole government property (a shard of Speaker Pelosi's office sign); he engaged in chants and yelling (e.g. "Stop the steal"); he indicated that he was looking for members of Congress while inside the building (Merry chanted "Nancy, Nancy," and "c**t"); and he spent a significant amount of time in the Capitol Building (nearly 40 minutes). Merry arguably had some aggravating factors that Amsini did not: Merry brought along a 21-year-old family member and gave an interview on Capitol grounds where he appeared to be proud of storming the Capitol. However, distinct from Amsini, Merry did not steal the government property himself (he encouraged his family member to do it); and Amsini posted a photo of himself in the highly symbolic Senate Gallery to social media, and explained that he and other rioters were looking to make a citizens arrest of the Senators. Judge Boasberg imposed a sentence of 45 days' imprisonment, 9 months' supervised release, and 80 hours of community service. A modestly longer sentence of incarceration is appropriate here considering Amsini entered and posted from the symbolically significant Senate Chambers.

In *United States v. Jason Riddle*, 1:21-CR-00304, defendant Riddle pled guilty to one misdemeanor count of 18 U.S.C. § 641 and one count of 40 U.S.C. § 5104(e)(2)(G). Similar to Amsini, Riddle entered the Capitol Building from the chaotic West side (using the Northwest Senate doors, also known as the Parliamentarian's doors); he entered a sensitive area in the Capitol Building (the Senate Parliamentarian's Office); and he stole from the Capitol Building, including government property (a bottle of wine from the Senate Parliamentarian's Office which he drank, and the Parliamentarian's Senate Procedure book, which he sold outside the Capitol Building for

$40).  Riddle also had additional aggravators not present for Amsini: Riddle gave interviews after the riot showing lack of remorse; deleted evidence from his social media and phone; and participated in the attack of the Capitol despite being a veteran sworn to defend the Constitution. However, Riddle was in the Capitol Building for a shorter amount of time (about 14 minutes); he did not enter the Senate Chamber/Senate Gallery; and most important, he was dealing with mental health and substance abuse issues not present in the instant case. Judge Friedrich imposed a sentence of 90 days' imprisonment on the 18 U.S.C. § 641 count; three years of probation on the 40 U.S.C. § 5104(e)(2)(G) count; 60 hours of community service; and mandatory mental health and alcohol treatment programs.

The instant case also bears similarity to *United States v. Robert Petrosh*, 1:21-CR-00347. In *Petrosh*, defendant Petrosh pled guilty to one misdemeanor count of 18 U.S.C. § 641.  Similar to Amsini, Petrosh ignored red flags upon entering the Capitol Building (including the sounds of Viking horns and exploding munitions and rioters shouting "f***ing traitors" on the West Lawn); he entered through the Senate Wing Door shortly after its initial breach (entered around 2:21 p.m.); he participated in the breach of the police line in the Crypt; he stole government property (two microphones from Speaker Pelosi's lectern in the center of the Rotunda); and he stayed in the Capitol Building for a significant period of time (about 30 minutes).  Petrosh had some additional aggravators, including smoking a cigarette inside the Rotunda and telling FBI agents during a post-plea debrief that he believed that members of Congress were "lucky that's all that happened." However, distinct from Amsini, Petrosh did not spend as much time in the Capitol (almost 20 minutes less than Amsini) and did not enter a sensitive space – the symbolically significant Senate Chambers/Senate Gallery.  There, Judge McFadden imposed 10 days of imprisonment, 12 months of supervised release, and $1,000 fine.  In light of the fact that Amsini spent much longer in the

Capitol, bragged on social media about his accomplishment, and entered a sensitive – and symbolically significant – area (the Senate Chamers/Senate Gallery), a significantly higher sentence of incarceration is merited here.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[6] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Amsini must pay $749 in restitution – $500 which reflects in part the role Amsini played in the riot on January 6 and an additional $249 which reflects the price of the government property stolen by Amsini.[7] *See* Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other

---

[6] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[7] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

governmental agencies as of October 2022. *Id.* Amsini's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 12.

## VII.   Fine

The defendant's conviction for violation of 18 U.S.C. § 641 subject him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b)(5). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $200-$9,500 (assuming the final offense level is 2). U.S.S.G. § 5E1.2(c).

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 3 months' incarceration, 60 hours of community service, 12 months of supervised release, and $749 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future

crime by imposing restrictions on Amsini's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Cytheria D. Jernigan*
Cytheria D. Jernigan
Assistant United States Attorney
DC Bar No. 494742
Detailed to the U.S. Attorney's Office
for the District of Columbia
601 D. Street, N.W.
Washington, D.C. 20530
(318) 676-3611 (v)
Cytheria.Jernigan@usdoj.gov